**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EUGENE WESTMORELAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 4330** |
| | ) | |
| **THOMAS DART, Sheriff of Cook** | ) | |
| **County, COOK COUNTY,** | ) | |
| **OFFICER ESTEBAN ARREGUIN, and** | ) | |
| **NURSE ELIZABETH JEFFERSON,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Eugene Westmoreland filed this lawsuit against Sheriff Thomas Dart, in his official capacity, and Cook County (collectively, the Sheriff), alleging that the Sheriff violated his rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act (RA), 29 U.S.C. § 794(a), while Westmoreland was housed in the Cook County Jail as a pretrial detainee. Westmoreland fell while climbing into an upper bunk and suffered a serious injury. He also asserts a claim under 42 U.S.C. § 1983 against Officer Esteban Arreguin and Nurse Elizabeth Jefferson for alleged deliberate indifference to his medical needs in violation of the Fourteenth Amendment. Westmoreland has moved for summary judgment on the issue of liability on his ADA and RA claims against the Sheriff. For the reasons stated below, the Court denies Westmoreland's partial motion for summary judgment but makes certain findings in his favor under Federal Rule of Civil Procedure 56(g).

**Background**

Unless stated otherwise, the following facts are undisputed.

**A.    Westmoreland's background and intake into Cook County Jail**

Westmoreland suffered from polio as a child.  He is therefore "disabled because of dramatic weakness and atrophy and lack of growth in his left leg due to polio."  Bauer Dep. 103:18-104:10.

Westmoreland was processed into the Cook County Jail on October 30, 2019. That same day, Dr. Gregory Haman—a physician at Cermak Health Services, the medical provider for the jail—evaluated Westmoreland as part of the intake process. Dr. Haman recorded the following history: "Patient reports diagnosed with polio at one year old and has had [left lower extremity] weakness since.  Reports that he has difficulty standing for long periods of time (5-10 minutes) due to discomfort in back." Pl.'s LR 56.1 SOF, Ex. 6 at 2.  Dr. Haman also noted that Westmoreland "[r]eports 12-13 mechanical falls per month but will catch himself and has never needed to go to the hospital for this.  Several days ago had mechanical fall in apartment, fell forward when L leg collapsed."  *Id*.  Dr. Haman documented that "given severity of deficit on exam, will house M3 given fall risk" and that, after a period of time, he would reassess Westmoreland's level of housing depending on whether he had fallen and how many times.  *Id.*   The "M3" designation means: "Medical Intermediate – Patients [sic] is recommended for housing with 24/7 nursing and access to special accommodations but does not need M4 Special Care Unit level of care (Residential Treatment Unit – RTU- see Bed Control key."  Pl.'s LR 56.1 SOF, Ex. 7 ("A Quick Guide to Health Alerts for Correctional Officers") at 6 (closing parenthesis missing in original).

Westmoreland was then assigned to Division 08, Residential Treatment Unit (RTU), Tier 3F—which is an ADA-compliant unit.

**B.    Follow up medical visits and issuance of a cane**

On November 4, 2019, Westmoreland was evaluated by a physical therapist named Jamie Crothers.  Crothers testified during her deposition that she observed during her examination that Westmoreland had an "obvious limp."  Crothers Dep. at 125:19.  Crothers also documented that Westmoreland "self-reported a high fall frequency when in the community," including falling more than ten times a month.  Pl.'s LR 56.1 SOF, Ex. 10 at 1-2.  Based on her evaluation, Crothers recommended issuing Westmoreland a cane because he "reported feeling unsteady in his unfamiliar environment compared to his home where he had his home set up where he felt comfortable walking unassisted."  Crothers Dep. at 47:6-11.

The following day, November 5, 2019, Dr. Haman reassessed Westmoreland and determined that he had no falls since arriving at the Jail on October 30.  Dr. Haman signed off on an order to issue Westmoreland a cane based on Crother's recommendation.  Dr. Haman determined that, with a cane, it was medically safe for Westmoreland to be housed with the Jail's general population.

On November 7, 2019, following Dr. Haman's reevaluation, Westmoreland was transferred to Division 10, Tier 2A.

**C.    Medical alerts and bunk assignments**

Cermak Health Services has a policy regarding the communication of detainees' health needs from health staff to correctional staff via a system of health alerts.  These alerts are posted in the Cook County Department of Corrections' (CCDOC) electronic

information systems.  The policy states, in relevant part, that a detainee with a cane alert—such as the one associated with Westmoreland—should be "handled as Lower Bunk."  Pl.'s LR SOF, Ex. 7 at 4.  The "Lower Bunk" alert states that "The patient has a medical condition that increases the risk of injury due to a fall from an upper bunk. *Assign patient to a lower bunk*."  *Id.* at 6 (emphasis added).  Lower bunk permits notify correctional staff that, for medical reasons, a detainee must be assigned a lower bunk.

During his deposition, Dr. Haman testified that when he would identify a detainee with a mobility disability at intake—as he did with Westmoreland—"there were orders that we could place in the computer regarding their housing and/or if they needed assistive devices for a deficit."  Haman Dep. at 12:23-13:9.  Dr. Andrew DeFuniak—a physican who has been employed by Cermak Health Services since 2003—testified during his deposition that, in his experience, entering an alert for a detainee to have a cane in the CCDOC system results in the detainee being assigned to a lower bunk.  Dr. Haman testified that he did not assess whether Westmoreland had strength to reach a top bunk when he recommended Westmoreland's transfer to general population because:

> [t]he cane order that was in place in our directives to DOC means that a patient with a cane order should be housed on a lower bunk.  So for me to assess if he could – could or could not go up to a high bunk was, I'd say, medically unnecessary.

Haman Dep. at 69:10-70:10.  More specifically, Dr. Haman's understanding was that when Westmoreland was transferred to a new location from RTU, he would be assigned to a lower bunk "because the cane order, per our documentation of understanding with DOC, implies that a patient – not implies, but explicitly says that patients with canes should be housed in lower bunks because he had a cane and the order was in place."

*Id.* at 70:20-71:4.  But despite having a medical alert for a cane, Westmoreland did not have a separate alert for a lower bunk.

Regarding bunk assignments, Officer Arreguin—the tier officer assigned to Tier 2A on the day of Westmoreland's fall—testified that "the detainees usually decide that amongst themselves," Arreguin Dep. at 44:5-6, unless one of the detainees has a lower bunk permit.  In that situation, Arreguin testified, he would advise the detainee who was already in the cell that he or she would need to move to the top bunk to accommodate the other detainee's lower bunk permit.

Sergeant Darryl Houston—who has been assigned to the 3:00 P.M. to 11:00 P.M. shift in Division 10 for the past seven years—testified that the guidance he received regarding bunk assignments was that "medical decides whether they get a bottom bunk, and classification decides where they go."  Houston Dep. at 49:1-11. Houston further testified that if a detainee was supposed to have a lower bunk but a lower bunk order was not entered, he will "go to the medical staff and ask [the detainee] to be re-evaluated" or "make sure they get to the doctor so they can see the doctor."  *Id.* at 91:13–92:22.  Houston also testified that "[o]nce I give it [a detainee's request to be moved to a lower bunk] to them, I wash my hands of it because I don't know what the process is."  *Id.* at 122:4-6.

Officer Castaneda—who was assigned as back-up on Tier 2A on the day of Westmoreland's fall—testified that if a detainee says he needs a lower bunk but a lower bunk order has not been entered, he will "call the nurse in the dispensary," and the nurse will schedule him to be seen by a doctor.  Castaneda Dep. 51:7–52:3.

Arreguin also testified that he has no recollection of being trained on how to

interact with disabled individuals in the Jail or of receiving the "Quick Guide to Health Alerts for Correctional Officers."  Arreguin also testified that he has never been instructed that a detainee with a cane alert should be given a lower bed.  The Sheriff disputes the relevance of whether Arreguin received guidance on health alerts related to bunk assignments, arguing that the classification unit is the unit responsible for determining a detainee's cell assignment.  The Sheriff also offered evidence that Arreguin received training related to the ADA on February 7, 2018, which Westmoreland disputes given Arreguin's testimony that he did not recall receiving such training.  And that aside, the Sheriff cites no evidence on what the purported ADA training involved. Westmoreland does not dispute that Arreguin's training file also states he received training on the Sheriff's Office policies and procedures on February 11, 2019, and training on discrimination, harassment, and retaliation on June 10, 2019.  Again, however, there is no evidence that any of this training involved bed assignments for disabled detainees or how to deal with a detainee with a permit for a cane.

**D.  Westmoreland's transfer to Division 10**

As previously noted, at around 10:00 A.M. on November 7, 2019, Westmoreland was transferred from Division 08 to Division 10.  Video surveillance footage from the Jail shows Westmoreland travelling on foot to Division 10, with his cane, escorted by Officer William Richard, a "movement officer."  At approximately 10:01:45 AM, Westmoreland is seen stumbling on the walk to Division 10 and stabilizing himself on the wall beside him. Westmoreland is seen arriving to Division 10, Tier 2A at approximately 10:30 AM, approximately thirty minutes after leaving Division 08.

On November 7, 2019, Arreguin was assigned as the tier officer in Division 10

from 7:00 A.M. to 3:00 P.M.  Arreguin testified that he has no independent recollection of the events of November 7, 2019, of any conversations he may or may not have had with Westmoreland, or even of Westmoreland himself.

Westmoreland testified during his deposition that, upon arriving to Tier 2A, he immediately observed that it would not be accessible to him in various ways and told Arreguin this.  Westmoreland further testified that Arreguin said he would get Westmoreland the form he would need to fill out to request a change in his tier assignment.  Westmoreland testified, however, that Arreguin made no effort to actually get him the supposedly required form and instead, pointed to another detainee who was on crutches and said something to the effect of: if that guy can move around in this place, then so can you.  The Sheriff disputes the relevance of Tier 2A's overall accessibility because it contends that Westmoreland's claim only concerns his bunk assignment and the Sheriff's denial of the benefits of the program or activity of sleeping. The Court agrees with the Sheriff and will therefore focus on Westmoreland's contentions regarding the claimed denial of the "program or activity" of sleeping.

### E.    Westmoreland enters Cell 2107 for the first time

At approximately 11:00 A.M., due to a medical emergency on the tier, all detainees—including Westmoreland—were placed under lockdown in their cells. Arreguin showed Westmoreland to his cell, Cell 2107.  Westmoreland testified that before shutting the cell door, Arreguin indicated—albeit briefly due to the ongoing medical emergency—that Westmoreland was assigned to the top bunk.[1]  The Sheriff

---

[1] It is undisputed that Westmoreland's assigned cell mate, Leron Wade, had a "Lower Bunk" alert and was therefore assigned to the lower bunk in Cell 2107.

disputes that Arreguin indicated to Westmoreland in that moment that he was assigned to the top bunk, but all it cites for this is that Arreguin testified he could not recall what took place on November 9, 2019, which isn't enough to create a genuine factual dispute. Westmoreland was in Cell 2107 for approximately six minutes before the medical emergency was cleared and he and the other detainees on the tier were released from their cells.

F.     **Westmoreland requests to move to a lower bunk**

Westmoreland testified that when he was let out of his cell following the medical emergency, he approached Arreguin about his need to be assigned to a lower bunk given his disability. Specifically, Westmoreland testified as follows:

> I believe I had more conversation with the officer asking him to give me the form to fill out. And at that point after I had observed the cell, I told him about the cell, how closed it was, how small it was. And if I fall, I could hurt myself because of my disability. I told him that I was prone to falling a lot. And again, he said the only thing he could do is give me a form to fill out. And I also mentioned that there is no way I could get up on the top bunk because that was my assigned bed, rather, and he said the guy on the bottom had an order to sleep down there. So there was nothing he could do but get me a form to fill out, and he would provide the form.

Westmoreland Dep. at 216:22–217:13. Westmoreland testified, however, that Arreguin did not get him the forms he had promised:

> [H]e just rushed me off basically, and he never brought the form, basically, and I sat there and waited and waited and no form. No, nothing. So he promised me two forms, a request form to be transferred out and a form to sleep on the bottom bunk, and he never brought either of them. The next thing I know it was time to be locked up again.

*Id.* at 229:15-24. A grievance filed by Westmoreland on November 21, 2019 (after his fall) also describes his conversation with Arreguin, stating—among other things—that he "reminded [Arreguin] about [his] bad leg and how [he] would have a problem climbing

up there."  Pl.'s Resp. to Defs.' LR 56.1 SOF, Ex. 1.

As indicated earlier, Arreguin had no independent recollection of the events of November 9, 2019.  During Arreguin's deposition, defense counsel asked him a series of questions about what he would have done in a situation such as the one alleged by Westmoreland.  Arreguin testified that had he been made aware that Westmoreland was physically unable to access to top bunk, he would have "just made a phone call to intake officer to see if there was anywhere that [Westmoreland] could be housed.  Even though he did not have a lower bunk permit, it's a simple phone call thing to do.  It's not rocket science."  Arreguin Dep. at 159:23–160:21.  Moreover, Arreguin testified that such calls would be recorded in the tier log.  Because no such calls were recorded in the tier log for November 7, 2019, Arreguin testified that Westmoreland must not have told him that he was physically unable to get to the top bunk.

## G.  Westmoreland goes into Cell 2107 for the second time

Around 1:00 P.M. the same day, Westmoreland and the other detainees on his floor were placed under lockdown for several hours, prior to a routine shift change. Westmoreland testified, "I believe it was lockup time, we had to go to the cells, and what I did was I sat there in the cell and sort of waited for this guy to bring me some forms to fill out, basically."  Westmoreland Dep. at 236:1-9.  According to Westmoreland, for detainees, this is typically "sleep time . . . because it's like two and a half hours before they can come back out.  So that's rest time.  Everyone goes in their cell, and we sleep, or read or something like that."  Westmoreland Dep. at 239:2-7. Westmoreland testified that—because he was exhausted from his thirty-minute walk from Division 08, and because he did not have a lower bunk to rest on—he sat down on

9

the metal stool inside the cell and began nodding off.  The cell appears as follows:



Pl.'s LR 56.1 SOF, Ex. 53.  The Sheriff disputes that Westmoreland was tired or

exhausted, arguing that "the video footage of [Westmoreland] does not show any signs

that [he] was tired or exhausted."  Defs.' Resp. to Pl.'s LR 56.1 SOF ¶¶ 47 & 49.

**H.    Westmoreland's fall**

At around 1:30 P.M., Westmoreland attempted to climb to his assigned top bunk

to sleep.  As depicted in the above screenshot of a video taken of Cell 2107, there is no

ladder that connects the top bunk to the bottom bunk.  When asked why he tried to

climb to the top bunk despite knowing it was dangerous for him, Westmoreland testified:

"I got tired. I saw my cellmate resting, and I could imagine everyone else was resting because it was awful quite [sic] there, and I just took a chance and climbed up to the top bunk, but, unfortunately, I didn't make it." *Id.* at 240:4-9. When asked why he didn't just sleep on the floor of the cell,[2] Westmoreland stated that he wouldn't do that because: it was dirty; this was his first time at the Jail and he didn't know if they had rules against sleeping on the floor; and he wasn't sure if he would be able to get back up off the floor.

While trying to climb to the top bunk, Westmoreland testified, he slipped and fell, hitting his neck on the edge of the metal desk on the way down and landing on the floor. Westmoreland testified that his cellmate proceeded to get up and bang on the door, calling for help. Surveillance footage from the tier shows staff members approach Cell 2107 at approximately 1:31:59 P.M. Westmoreland testified that Nurse Jefferson brought a wheelchair to the door of his cell—as the cell's door was not wide enough to allow the wheelchair to be rolled into the cell—and asked him to get into the wheelchair. Westmoreland testified that:

> I attempted to move to the wheelchair, but I couldn't do it. I asked for help. I told them, would you please help me off this floor, but they refused to help. They said -- the only thing I can remember was their telling me, okay, well, if you can't make it in this wheelchair, you refused medical attention, but I never refused medical attention. And the next think [sic] I know -- and also this guy, I have to say this, the tier officer was yelling, my shift is about to end. I don't want to do any paperwork, get up off that floor.

*Id.* at 265:10-24. A note made by Nurse Jefferson on the day of Westmoreland's fall states that he refused medical attention. The grievance filed by Westmoreland after his

---

[2] Houston testified during his deposition that detainees sometimes pull their mattresses onto the floor to sleep if they have not yet been able to obtain a lower bunk permit, as such permits cannot be obtained instantaneously. Houston also testified, however, that he had no recollection of the events of November 7, 2019.

fall states that he could not get up because his "back and shoulders were burning with pain."  Pl.'s Resp. to Defs.' LR 56.1 SOF, Ex. 1.

Around 1:45:25 P.M., video surveillance footage from the tier shows the staff walking away from Cell 2107 with the wheelchair in tow.  Westmoreland testified that he remained on the floor for about two hours until a new tier officer arrived after shift change around 3:30 P.M.  He further testified that the new tier officer called Houston to come assist and that two other detainees helped him up off the floor, out of the tier, and to a wheelchair at approximately 3:52:53 P.M.  This is shown in the following screen shot (with faces blurred for privacy reasons):



Pl.'s LR 56.1 SOF, Ex. 54.

**I.      Westmoreland's treatment and injuries post-fall**

After Westmoreland was taken to Cermak Health Services from Tier 2A, he was sent to Stroger Hospital, where he remained for several weeks until November 26, 2019.  While at Stroger Hospital, "Dr. Diane Sierens performed a cervical discectomy

and fusion at C3-4 and C4-5 to relieve the spinal cord compression."  Pl.'s LR 56.1 SOF, Ex. 1 at 23, 25.  Westmoreland is now confined to a wheelchair.

On December 12, 2022, the Sheriff's retained expert, Dr. Jerry Bauer, conducted an independent medical evaluation of Westmoreland.  Before the evaluation, Dr. Bauer reviewed medical records and deposition testimony associated with this case.  He testified during his deposition that it was "[v]ery obvious" that Westmoreland's lower left extremity was weaker than his right lower extremity.  Bauer Dep. at 51:5-10.  Dr. Bauer further testified that he "thought [Westmoreland's] leg was profoundly weak."  *Id.* at 67:15-68:2.  He also testified that he did not believe Westmoreland had the ability to get up from the floor unassisted on November 7, 2019 and elaborated, "I think he would have had difficulty getting up from the floor whether he fell or not."  Bauer Dep. at 101:4-17.

Westmoreland's retained expert, Dr. Richard Lazar, opined that Westmoreland's disability is permanent and will require him to use a full-time medical attendant for the remainder of his life.[3]  Dr. Bauer testified that he concurred with Dr. Lazar's opinion except that he does not believe Westmoreland's confinement to a wheelchair is related to his fall.

## J.    Westmoreland files suit

Westmoreland filed this lawsuit on August 13, 2021, alleging that the Sheriff violated his rights under Title II of the ADA and the RA and that after his fall Arreguin and Jefferson denied him access to medical care in violation of the Fourteenth

---

[3] The Sheriff disputes the relevance of this fact regarding Westmoreland's motion for summary judgment on the issue of liability, as the motion does not concern damages.

Amendment.

## Discussion

To prevail on a summary judgment motion, the movant must demonstrate that there is no genuine dispute as to any material fact and that he is entitled to a judgment in his favor as a matter of law. Fed. R. Civ. P. 56(a). In making this determination, the Court must "construe all facts and inferences in favor of the nonmoving party." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Summary judgment is appropriate "when no genuine issue of material fact exists such that no reasonable jury could find for the nonmovant." *Id.*

Westmoreland's motion for partial summary judgment concerns the question of liability on his claims under the ADA and RA. First, he claims that he was denied access to the program or activity of sleeping by virtue of his assignment to a top bunk that he could not access due to his disability. Westmoreland contends that the Sheriff had knowledge of the denial because (1) the Sheriff knew that he medically required a lower bunk but nonetheless assigned him to a top bunk; and (2) Westmoreland had at least two conversations with Arreguin on November 7, 2019, regarding the inaccessible conditions in Division 10, Tier 2A, including the assignment to the top bunk. Westmoreland further contends that Sheriff failed to act despite having that knowledge and that he was denied the benefit of sleeping when he attempted to reach the top bunk and fell.

## A.    Claims under Title II of the ADA and the RA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Likewise, the RA prohibits a "qualified individual with a disability" from being "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" as a result of his disability.  29 U.S.C. § 794(a).

The analysis under each statute is the same, except that the RA requires receipt of federal funding, which is not disputed here.  *Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 671 (7th Cir. 2012).  To establish a violation of Title II of the ADA and the RA, Westmoreland "must prove that he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity[,] . . . and that the denial or discrimination was by reason of his disability."  *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal quotation marks omitted).

A correctional facility may violate the ADA and the RA if it denies an inmate with a disability access to a bed for sleeping.  *See Edwards v. Dart*, No. 21 C 5665, 2022 WL 3543474, at *5 (N.D. Ill. Aug. 17, 2022) (holding that sleep and sleeping facilities are covered by Title II).  "Whether the 'program, activity, or service' is characterized as access to sleep itself or access to adequate sleeping facilities, these are 'fundamentals' of living in incarceration."  *Id.* (quoting *United States v. Georgia*, 546 U.S. 151, 157 (2006)); *see also*, *Simmons v. Godinez*, No. 16 C 4501, 2017 WL 3568408 (N.D. Ill. Aug. 16, 2017); *Smith v. Dart*, No. 20 C 1381, 2020 WL 7260802, at *3 (N.D. Ill. Dec. 10, 2020) .

The ADA and RA also "provide[] for damages if a public official intentionally discriminates because of disability."  *Morris v. Kingston*, 368 F. App'x 686, 689 (7th Cir.

2010). Though the Seventh Circuit has not yet decided whether discriminatory animus or deliberate indifference is required to show intentional discrimination, the parties are in agreement that deliberate indifference is the appropriate standard here. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 n.4 (7th Cir. 2014). Thus to prove intentional discrimination, Westmoreland must show that the Sheriff "*knew* that harm to a federally protected right was substantially likely and . . . *failed* to act on that likelihood." *Lacy v. Cook County*, 897 F.3d 847, 862 (7th Cir. 2018) (citation omitted). A prisoner's request for relief that falls on "'deaf ears' may evidence deliberate indifference." *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015).

In addition, the Court agrees with the Sheriff that, as the Seventh Circuit has characterized it, Westmoreland is "using the ADA and the Rehabilitation Act to pursue, in federal court, what is effectively a state-law tort claim." *Turnage v. Dart*, 16 F.4th 551, 552 (7th Cir. 2021). Thus, to recover damages, Westmoreland must prove causation of injury, a "standard element of tort liability." *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012).

In sum, in order for Westmoreland to show that he is entitled to damages under the ADA and RA, he must show that (1) he is a qualified individual with a disability; (2) he was denied access to the program or activity of sleeping; (3) the denial was on account of his disability; (4) the Sheriff was deliberately indifferent to the denial of access; and (5) that Sheriff's denial of access was the proximate cause of an injury.

## B. Qualified individual with a disability

A "disability includes the limitation of one or more major life activities, which include walking, standing, bending, and caring for oneself." *Jaros*, 684 F.3d at 672; 42

U.S.C. § 12102(2)(A). The Sheriff does not appear to dispute that Westmoreland is a qualified individual with a disability as defined by the ADA and RA. Nor could he reasonably dispute this given the uncontested evidence of Westmoreland's severe mobility issues in his left leg caused by his childhood polio and his use of a cane to help him walk and prevent falls.

## C. Denial of access by virtue of disability

The ADA and RA prohibit denying individuals with disabilities access to a public entity's programs and services due to structural barriers. Title II requires a public entity, such as a correctional facility, to "take reasonable measures to remove architectural and other barriers to accessibility." *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (citing 42 U.S.C. § 12131(2)). As described above, the Jail has policies regarding health alerts for detainees with accessibility issues, and those health alerts are designed to ensure that a detainee is accommodated accordingly. One such health alert is the cane alert that was assigned to Westmoreland, and the associated lower bunk alert that, under Cermak's alleged policy, is supposed to go hand-in-hand with a cane alert.

There is no genuine dispute that, notwithstanding Westmoreland's obvious need for a lower bunk accommodation, he was assigned to a top bunk that he could not properly access and thus was denied access to a place to sleep. The Sheriff contends, however, that Westmoreland was not denied the benefit of sleeping because he had just arrived to the tier, it was the middle of the afternoon, he could have slept on the floor or on the stool, he made no request to be moved to a lower bunk, and if he did make such a request, Arreguin was working on it when Westmoreland took the risk of climbing to the top bunk.

The latter contentions regarding Westmoreland's requests and/or Arreguin's efforts to accommodate those requests may be relevant to the question of deliberate indifference and/or causation. But any disagreement over whether and when Westmoreland notified Division 10 staff of his need to be moved to an accessible bed—and whether any steps were being taken to accomplish this—does not change the undisputed fact that despite having a cane alert, Westmoreland was assigned to the top bunk in Cell 2107. It is also disputed that the lower bunk in that cell was unavailable because it was assigned to Westmoreland's cellmate (who had a lower bunk permit in the system).

Moreover, a request for an accommodation is unnecessary where the "entity will know of the individual's need for an accommodation because it is 'obvious.'" *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007); *see also, e.g.*, *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required."); *Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 926 (N.D. Ill. 2009) ("[W]here a disabled individual's need for an accommodation is obvious, the individual's failure to expressly request one is not fatal to the ADA claim.") (internal quotation marks omitted). Westmoreland was not required to request an accommodation from the Sheriff because his disability and need for an accommodation were obvious; no reasonable fact finder could find otherwise. And even if that were not the case, Westmoreland testified that he *did* request an accommodation.

Finally, the Sheriff's contentions regarding the timing of Westmoreland's desire to

sleep or his alternative sleep options (e.g., the floor of his cell) lack merit.  As a detainee

at the Jail, Westmoreland had virtually no control over his movement, his schedule, or

his access to jail personnel or resources.  For example, shortly after arriving to the tier,

Westmoreland was placed under lockdown in his cell for several hours.  Westmoreland

testified that he was exhausted[4] after having just walked thirty minutes from one part of

the jail to another with his severe limp, and had stumbled along the way.[5]  He also

testified that during lockdown time, given the obvious lack of other options, most

detainees use that time to rest.  On this point, there is no contrary evidence.  Under the

ADA and the RA, Westmoreland was entitled to access the activity of sleeping.  But

because of his disability and given his upper bunk assignment, he was unable to do so

without a significant risk of injury.  The Sheriff's contention that Westmoreland was not

denied access to sleeping because he could have slept sitting up on the cell's metal

stool or on the floor of his cell borders on frivolous and smacks of a nonchalant attitude

toward equal access for disabled detainees.

Even viewing the record in the light most favorable to the Sheriff, Westmoreland

has established that he was denied access to the program or activity of sleep at the

Cook County Jail "by virtue of his disability."  *Lacy*, 897 F.3d at 853.  No reasonable fact

finder could find otherwise.

**D.  Deliberate indifference**

To recover compensatory damages under the ADA or RA, a plaintiff must show

---

[4] Dr. Bauer testified that he would expect a person with Westmoreland's disability to tire
more easily than an otherwise healthy 60-year-old man.
[5] The Court also notes that Westmoreland's stumble on his way to Division 10 was
captured on the jail's video surveillance system.

that the Sheriff acted with deliberate indifference. As noted earlier, this is an official-capacity suit against the Sheriff. But unlike in a case under 42 U.S.C. § 1983, the ADA and the RA provide for vicarious liability (the Sheriff does not argue otherwise). *See, e.g., Duvall*, 260 F.3d at 1141; *Morales v. City of New York*, No. 13-cv-7667, 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016); *Mapp v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, No. 15 C 3800, 2016 WL 4479560, at *4 (N.D. Ill. Aug. 25, 2016); *Phillips v. Tiona*, No. 10-cv-00334, 2011 WL 2198532, at *11 (D. Colo. Mar. 11, 2011); *Guynup v. Lancaster County*, No. 06-4315, 2008 WL 4771852, at *1 (E.D. Pa. Oct. 29, 2008). Thus it is sufficient if either Sheriff Dart or other Sheriff's personnel acted with deliberate indifference.

Deliberate indifference is established "where an official realizes that a substantial risk of serious harm to a prisoner exists, but disregards it." *Perez*, 792 F.3d at 781. In the context of ADA cases, a public official acts with deliberate indifference when he has "knowledge that a harm to a federally protected right is substantially likely" and he fails to "act upon that likelihood." *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1070 (N.D. Ill. 2016) (citing *Duvall*, 260 F.3d at 1139)); *see, e.g.*, *Perez*, 792 F.3d at 781 ("[W]e have stated that deliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it.") (internal quotation marks omitted).

Westmoreland contends that the record establishes that the Sheriff (a term the Court uses here to include both Sheriff Dart and his subordinates) acted with deliberate indifference. Westmoreland contends that the Sheriff was aware that his ADA and RA rights were being violated but, despite this, allowed the denial of an accessible place to

20

sleep. He appears to advance two theories regarding the Sheriff's knowledge of, and indifference to, the violation of his rights.

First, Westmoreland contends that the Sheriff was on notice of a violation of his rights when he alerted Arreguin of the accessibility issues with the tier in general and, in particular, his top bunk assignment. Westmoreland testified that he notified Arreguin as soon as he arrived to Tier 2A that it was not accessible for him in myriad ways, but that Arreguin essentially hand-waved his concerns and said he would get Westmoreland a form to request the transfer. Westmoreland further testified that he broached the subject of accessibility with Arreguin again after he was released from his cell following the short medical emergency lockdown, which was his first opportunity to see his cell and learn of his upper bunk assignment. Westmoreland testified that he specifically told Arreguin that he could not access the top bunk. Westmoreland contends that Arreguin failed to act despite being alerted of the need for an accommodation.

For his part, Arreguin could not recall the events of November 7, 2019 when his deposition was taken. But that does not mean that Westmoreland's account of that day is completely uncontroverted. A reasonable jury could find, based on Arreguin's testimony, that neither of the conversations described by Westmoreland took place. Arreguin testified that it is standard practice for such requests to be recorded into the tier log, and there is evidence that no such record exists in the tier log for that day. Moreover, Arreguin testified that his usual practice, if made aware of a detained person's inability to access the upper bunk, would have been to make a quick call to his supervisors and/or an intake officer to resolve the issue. Westmoreland contends that Arreguin's testimony is inadmissible speculation, but in the Court's view it is admissible

testimony of habit and practice under Federal Rule of Evidence 406. A jury very well could discount Arreguin's testimony, but for summary judgment purposes the Court concludes that a reasonable jury could find that Arreguin was not alerted to Westmoreland's accessibility issue regarding the top bunk.

Even if, however, no reasonable jury could find that Arreguin was not notified of Westmoreland's need for a lower bunk, that would not end the inquiry. The facts regarding Arreguin's actions or inaction following Westmoreland's request are genuinely disputed. According to Westmoreland's own version of events, Arreguin *did* tell Westmoreland that he would bring him a form to request the change. Though Westmoreland contends that Arreguin did not follow up, a reasonable jury could find from the evidence that Arreguin did not act with deliberate indifference, particularly given his understanding that Division 10 correctional staff are not themselves responsible for assigning beds to detainees, even those who have a cane alert. The evidence would also support a finding that a change in bunk assignment cannot be effectuated instantaneously.

Westmoreland's other (and, to some extent overlapping) theory of deliberate indifference is that the Jail's policy is that all detainees with canes are to be provided with a lower bunk but that this was not followed in his case due to poor training or inadequate communication and that the Sheriff (including relevant staff) was deliberately indifferent in this regard. A reasonable jury could so find, but that is not the only reasonable inference that may be drawn from the evidence. In particular, there is testimony that issuance of a cane does not *automatically* result in a lower bunk permit,

as some detainees with canes can access a top bunk.[6]   In addition, Arreguin did receive *some* training on ADA compliance, though the record does not reflect whether bunk assignments for disabled detainees was part of it.  In short, Westmoreland's evidence supporting this theory does not entitle him to summary judgment.

For these reasons, deliberate indifference is an issue for trial.

**E.    Causation**

As previously noted, because Westmoreland seeks damages for injuries he contends he suffered as result of the denial of access, he must show that the violation of his rights was the proximate cause of his injuries.  *Whitlock*, 682 F.3d at 582 ("causation is a standard element of tort liability").  As the Sheriff notes, Westmoreland did not address causation in his motion for summary judgment and thus forfeited the point for summary judgment purposes.  *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

Even though Westmoreland forfeited the point, there is one issue that the Court finds itself constrained to address.  The Sheriff appears to argue that Westmoreland caused his own injury by attempting to climb to the top bunk despite knowing that it was risky for him to do so, instead of waiting to be relocated to a hypothetical different cell with an available bottom bunk.  This, however, would not negate proximate causation as a matter of law, or likely even as a matter of fact.  In fact, it sounds more like a defense of contributory fault.  The Sheriff cites nothing supporting this as a defense.  One can

---

[6] Houston testified that "[the jail has] actually had four or five -- no, maybe ten guys that got canes that's running up and down the court playing basketball, but the doctors give them canes," Houston Dep. at 117:8-11, and that "[t]he doctors . . . they don't do medical assessments. They just give [a cane] to them because they say they need it." *Id*. at 117:5-7.

imagine a case in which a detainee confined to a wheelchair needs to get up a curb or small step to get to his bed to sleep. But there is no ramp or curb cut for wheelchair access, so the detainee tries to mount the step or curb and falls, causing an injury. It would be strange indeed if, in those circumstances, the jailkeeper could avoid liability by saying that the wheelchair-bound person should have just gutted it out or slept in his wheelchair. This is not all that different from the Sheriff's argument that, if he needed to sleep, Westmoreland should have just curled up on the floor. Hypotheticals aside, the Sheriff offers no authority supporting the proposition that this form of contributory fault amounts to a viable defense under the ADA or RA. *Cf. Whitlock*, 682 F.3d at 583 ("multiple proximate causes are often present" and "it does not matter that other acts are also proximate causes of the ultimate violation") (internal quotation marks omitted).

The bottom line, however, is that that causation is "fundamentally a jury question." *Taylor v. City of Milford*, 10 F.4th 800, 812 (7th Cir. 2021); *see also*, *Wis. Mut. Ins. Co. v. United States*, 441 F.3d 502, 505 (7th Cir. 2006). There is no basis on the present record to take it from the jury's hands.

### Conclusion

For the reasons stated above, the Court denies plaintiff's partial motion for summary judgment on the issue of liability [dkt. no. 86] but determines under Rule 56(g) that he has established that he is a qualified individual with a disability; was denied access to the program or activity of sleeping; and that the denial was on account of his disability. The case is set for a telephonic status hearing on July 10, 2023 at 9:00 a.m. for the purpose of setting a trial date and discussing the possibility of settlement. The

following call-in number will be used:  888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 28, 2023